I would like to start, because facts are important in cases of this nature, with a detailed review of the specific particularized facts in this case. First of all, the Code 3 emergency response was initiated to respond to a fellow officer's request, a fellow by the name of Deputy Lawless. Officer McKinney, on duty, responded to the emergency call with lights, siren, and speed, which is a Code 3 call, to proceed to the location where Deputy Lawless was in distress. Number three, McKinney activated his lights, siren, and proceeded. He was traveling to the Lawless location, well in excess of the posted speed limit, as he was permitted to do under an emergency call. We do not know the top speed that he reached. The Code 3 call was canceled, but McKinney was still directed by his superior officer to continue moving to the Lawless location. In other words, immediate attention to the issue that was facing Officer Lawless was still to be addressed by Officer McKinney. McKinney acknowledges that he heard the Code 3 cancellation. He deactivated his lights and siren and began to reduce his speed. At the time of the accident, McKinney was still proceeding to the Lawless location as directed by his supervisor. He was still responding to the call dealing with Officer Lawless. In other words, at the time of the accident, McKinney was still on this call. He was still going to Lawless to assist him as directed. A rapid response was still required, and there was, I submit, nothing arbitrary about his conduct. Since you're going through the details, didn't he get a transmission from the officer that he was going to, to assist? Didn't he get a what? Did he get a transmission from the officer he was assisting, saying that he didn't, it was not an emergency? Didn't he know that? But his supervisor said... I know, but didn't he know that? Didn't the officer say, no, this is not an emergency? As a matter of fact, that's why it was a step down, right? It was a step down, but... You didn't mention that, because you say it was still an emergency. The officer said, no, there's no need for a code, correct? Your Honor, I respectfully... Well, tell me what he said then. What did the other Lawless say? The call for reading was to cancel. And why was it canceled? Because of... Do you know the record? Yes, sir. It was canceled, but he was... It was canceled because, what? Because of further communication. And that further communication was from Lawless, right? And what did he say? I don't have the specific quote in front of me, Judge. Well, you went through it in detail, but he said basically, I have this, I have the person in custody, and there's no need to have a code, correct? My point is, Your Honor... I know it's your point. I'm not asking for points in terms of facts. You opened it up because you went through all this detail about the facts, but you need to tell it all if you're going to say that. The officer who was the subject of the call, the place he was responding to, said, it's no need to have a code run on this, correct? Yes, sir. And did I admit that? No, you didn't. You didn't even mention that. What you said was that he was told that go to that location. No, sir. I told you that, with all due respect, the Code 3 was canceled, and Officer McKinney acknowledged that. I know, but... Code 3 is the emergency. I know. And it was canceled, but he was told by his supervisor to continue toward Lawless, because whatever circumstances were there, he was still told by his supervisor, who heard what Lawless said, to continue toward Lawless's location. Right. But without... But he did acknowledge that the Code 3 was canceled. And the code required then for him to do the speed limit, correct? Correct. It required him, whatever speed he was going at the time, required him to slow down and become in compliance with the law. He turned off his lights and siren and continued to proceed in that direction, but he did not slow down fast enough. And how much time did he have? Well, that's in dispute. That's a fact question, isn't it? Either 41 seconds, based upon the evidence that the plaintiff presented in trial, or two minutes, based upon other evidence that the plaintiff presented. So you're saying that he couldn't have slowed down in two minutes? Sir, I'm saying that under either... You say at trial. You mean at summary judgment. I'm sorry. Summary judgment. I literally just went to look, because I thought... It is a summary judgment case, not a trial case. It is a summary judgment motion. I'm sorry, Your Honor. I'm not trying to be nitpicky, but it might matter here. But the point is, my position is, under the analysis of the cases that we've cited in that brief, whether it was 41 seconds or whether it was two minutes, he was still on a call at the time it happened, and the qualified immunity standard still applies. This case... Just because he's on a call? He's on call all the time. Police officers, when they're on duty, on call means nothing more than their duty. That was his assignment right there. Proceed to the location. Yes. That's no more than when he patrols. But the point is, he had no reason and no authorization to go without running code, with siren. And what's the evidence of speed in this case? You had to concede, what, 83 miles an hour? That's what the plaintiff's expert says, as of the time of the incident. Do we have contrary evidence in the record? Not at the summary judgment stage, we do not. Right. That is true right now, for purposes of summary judgment. That is the speed, but that is not the time that, between the time that he got the call and the time that the accident occurred. I just want to make sure I understand. The argument you're making, with reference to the qualified immunity standard, with respect to whether... That it doesn't matter whether it was an emergency or not. No, sir. That's... Well, not on the first prong, but on the second prong. I understood your brief to be making the argument that because he was responding to a call, under the Eighth and Ninth Circuits case law, that the fact that it was an emergency or not, at least in those circuits, would mean it doesn't matter. That the fact that he's owned police business responding to a call is sufficient to place it in, whatever we want to call it, the intent to harm bucket of Lewis. That is my point exactly, Your Honor. Based upon those three cases that are post-Lewis cases, which I'll refer to in a minute. And you have, in essence, sort of two arguments with respect to that, as I take it. One is that that should be the law, and two, at a minimum, the law was not clearly established on that point. That is correct, Your Honor. That is my point exactly. And Judge Kaine, in his oral, specifically said, and I will reference his comments, without an analysis of what the status of the law at the time, he said, the Fourth Circuit has not adjudicated the lawfulness of the precise conduct in question. And that there is relatively scant case law imposing liability on these specific circumstances. And that's why these circumstances are important. This started off as an emergency call. The emergency was canceled, Justice Gregory. And then, however, he was still directed to proceed to Lawless's location. And he was directed to proceed in a law, which required proceeding in a lawful manner. It is conceded that he had not slowed down sufficiently to comply with the law at the time of the accident. No question about that. But those facts are significant as far as the standard, the intent to harm standard, and also as to the application of qualified immunity, where there is no established law, clearly established law, law beyond debate, which is the standard. You're arguing that the standard, we have to show that he intended to run into them? Intent to harm is the standard we believe is appropriate. Oh, not gross indifference to safety? Your Honor, I'm going based on the Sawyer case. Okay. In that district case, I beg your analysis of the Sawyer case, in particular, go ahead and note 11 through 19, where that district, under an egregious case, still found as that accident in that case was 2014. The date of the decision was 2018. They found that the law was not clearly established that the officer would have believed that he was facing Fourth Circuit ramification, I mean, excuse me, Fourth Amendment ramifications for his conduct. They went through a detailed analysis of other circuits. I believe it was the 8th. It was the 9th. It was the 10th. As of the time of this opinion, as of the time of that accident in 2014, and they found that the law was not clearly established. And... What case is that? Pardon me, that's the Sawyer case. One of the cases that Judge Kane cited in his oral. Judge Kane, however, did not do the analysis that I submit, under the Sawyer case, needed to be done. Yes, I want to say, when you talk about the Sawyer, because you talk about Sawyer, but you also talk about the district court. Are you talking about the Third Circuit's opinion in Sawyer that Judge Kane relied upon, or is there a different, is it spelled S-A-U-E-R-S or S-A-W-Y-E-R-S? I just want to make sure I understand the case you're talking about. I think it's a circuit court case, not a district. It's the Third Circuit, yes. S-A-U-E-R-S versus the borough of something that I can't pronounce. And it's a 2018 decision. And what the court did in Sawyer, they did a detailed analysis as to whether the facts in that case were clearly established. Beyond doubt, they found that they weren't. Therefore, the officer in that case was entitled to qualified immunity, and they went so far as to say, from now on, you're on notice. Right, so the Sawyer case helps you on the clearly established point, but undermines your argument with respect to the 14th Amendment. As far as the parent argument? Not the parent argument, the substantive due process argument. Yeah, exactly. They found that going forward from there, then there would be, they recognized a substantive due process argument was viable. And in doing so, they diverged from the Eighth Circuit and the Ninth Circuit, and maybe to some degree the Tenth Circuit, although there's some ambiguity there. But at least the Eighth and the Ninth Circuit that had suggested that responding to a call, emergent or not, required intent to harm. Yeah. If you're looking at these, what I'm saying is the intent to harm is the applicable standard, not the deliberate indifference, which is what the plaintiff wants to apply. Although Sawyer disagrees with you on that, although the Eighth and Ninth Circuit do agree with you. Do agree with me on that, yes. But the bottom line is Sawyer, the court, and I think appropriately so, required a detailed analysis of what the status of the law was at the time of the accident. And it went so far as to refer to that as being clearly beyond debate. And I submit that it is not beyond debate in this circuit. It hasn't been decided. That analysis has not been done. And if you're inclined to go in that direction as far as this specific conduct and determine that intent to harm is the standard in this specific content set of facts, then it is incumbent that this officer be granted qualified immunity and then everybody's on notice in this circuit going forward. Otherwise, until that is established, you've got a situation where every rec case involving a state officer is going to be subject to a Fourteenth Amendment claim until there is an established rule that this conduct and the intent to harm can apply going forward, but not in this case. This was a 2016 accident. Two years before Sawyer, Judge Kaine, in his own order, said this is not clearly established in essence. Those weren't his exact words, but in essence. And yet he went through and found, based on other unrelated, necessarily unrelated cases, that this should be, that this is the law as of the time of this accident. I respectfully submit it was not. And if you're going to apply a standard, it needs to be applied post. Because as of 2016, this was anything but unclear. And if you're going to go in that direction, I think you follow the guidance of Judge Tratchler in this case, in the Doe versus SCDSS case, of which I'm very familiar with, where he, even though he found going forward that there could be a due process violation under the facts of those case, that case, that qualified immunity was still applicable to the DSS officials whose conduct was being complained of. He basically followed the analysis that the Sawyer court found or followed. And I submit that if you're going in that direction, that that is the criteria that, or that is the direction you should go in. I think the Parrott argument, my time is up, Parrott argument is set forth in our brief, which would bar these types of claims from the very beginning. We think it's, we invite the court to address that in this case. Thank you very much. Thank you, counsel. Mr. Callaway. Good morning, Your Honor. May it please the court. When Officer McKinney came speeding around a curve at 83 miles per hour and crashed into Neil Harkness's car, it was the product of his deliberate, considered decision to endanger other motorists for no legitimate law enforcement purpose. He knew there was no need to speed. He knew that his boss had told him two minutes earlier to slow down. Ms. Harkness's due process rights protect her from arbitrary and egregious misconduct, and the district court correctly found that Officer McKinney's actions meet that standard. Taken on in his face, the supervisor's statement even suggests that Officer McKinney chose to speed up after he had been ordered to slow down. This series of events shocks the conscience, and every reasonable officer in the position of Ms. Officer McKinney would have realized the legal jeopardy he faces for the devastating outcome that Ms. Harkness now has to deal with. At its core, Scottsdale due process protects citizens from arbitrary government misconduct. Arbitrary basically meaning capricious, without good reason, and at one's own pleasure. And all three of those descriptors really define what Officer McKinney did in this case. And there are five key facts, really, I would direct the court to on that fact. Before you get to that point, I was interested in the chief's question that your colleague did not know the answer to, which was what information Lawless conveyed to McKinney. There may have been, and I'm just, I frankly sort of read through this, and it's a little unclear to me, looking at J43, there's a reference there. It's not clear to me whether Lawless's statement is going to McKinney, but it looks like it did there. Is there another statement, or is this the best example I've got of what Lawless said? I believe it's both pages 43 and 44. 44 is the third party officer, Mr. Velez, but he certainly syndicates the same language because it's the same language on both of those pages, I believe, and the response specifically was to back off emergency response. That's what Lawless was conveying over the radio and on that call at the same time as both Hamby and McKinney. That's the line stated that units could back down on emergency response, but to continue to him. That's really the core language, and it's sort of a similar version on page 44. Correct, yes, that's the same language, to back off emergency response. Continue to him, that's not an issue here, but to back off emergency response. What we add to that, though, is his acknowledgment that he received that, and we also know what he subjectively interpreted that to mean because in response to receiving that call, and we'll add Hamby's call in just a second, but in response to those two calls, if you listen to the audio recording, what he says is, I'm backing down to Code 1. If you look at their policies, what does Code 1 mean? It means a non-emergency, normal response, follow the speed limit, follow all traffic laws at the time. You agree that a violation of the regulations, or even a violation of state law, is not itself the substantive due process violation, right? I mean, the fact that it was consistent or inconsistent, I mean, I think we said this in Temkin, it's been in a number of other cases, the consistency or inconsistency with a regulation doesn't do much to help you establish the deliberate indifference, right? I don't necessarily agree with that, Your Honor. I mean, for one, the Williams case from the Tenth Circuit where they specifically noted that the officer was driving in violation of state law on sirens and lights and speed. But think about what deliberate indifference really is getting at. What did the officer know, and what was he indifferent to? Here he was indifferent to the law. He was indifferent to the law that says if you are in a Code 1 as you said you were, then you have to follow the speed limit. If you're going to be in an emergency situation, you've got to have your lights and sirens on. That is both his policy, the Department policy, and that's state statutory law. So I think that is hugely relevant in determining deliberate indifference. Think about what those two terms mean. Did he deliberate, and was he indifferent? So what is the indifference goes to what do you know the standard is versus what conduct did you have relative to what you knew the standard would be. And so I believe that his violation of the law actually is very relevant, and it's one of the five facts that I intended to point out to the Court, that he violated both the policy and state statutory law. So I do think that's relevant. In Timken, maybe I'm misremembering, but in Timken he was in violation of policy there with respect to chasing the guy for a traffic violation, right? It's correct. But remember, Timken is a chase case, so it's a different circumstance. So I'm not saying it is the only factor, but it's one of the five factors, and it contributes to deliberate indifference. It may be evidence of, but it is not itself a violation. That's your argument. Correct, but remember, deliberate indifference comes in after Timken when Lewis establishes that, which I believe is a post-Timken case. And so they say this is deliberate indifference. So I don't think it's fair to say at all that a violation of either law or policy is not relevant or is not even an important factor when the determination of deliberate indifference. Other key factors here, one is his grossly excessive speed. The only evidence, as the Court noted earlier, of his speed at the time he entered the skid was 83 in a 45-mile-an-hour zone in the dead of night rounding a corner on a rural road. What else do we know? Another key factor is that we know that there was no emergency that he was going to. There was no urgency that he was going to because he had been told by Wallace specifically to back down off emergency response. He had been told by his supervisor, Sergeant Hamby, that he was canceling the Code 3, and then at that time he acknowledged subjectively on the audio recording, what I interpret that to mean is I need to back down to a Code 1, which means non-emergency response, follow the speed limits, and yet he didn't do it. Other important factors here is the amount of time that he had to deliberate. The CAD report contemporaneously captured computer data documenting the events that night show a span of time of 2 minutes and 15 seconds between the cancellation of the Code 3 and the accident or the collision itself. Plenty of time there to deliberate and to reform his conduct to what he said he knew it to be or needed it to be under the law and under the policy at the time. Also when it comes to arbitrariness, there's this idea that you do it at one's own pleasure, and for this I think the court really does need to take special note of Sergeant Hamby's report on page 43 of the appendix because there he indicates that after the Code 3 was canceled, after Wallace calls in and says back down to emergency response, after Sergeant Hamby says I'm canceling the Code 3, serendipitously perhaps, Sergeant Hamby's car and Officer McKinney's car pass. And what Hamby indicates there is that after that time, after McKinney acknowledges he should be Code 1, that he was following the speed limit. But then we know at the time of the collision that he was going 83 miles per hour. And so the necessary implication from that series of facts is he backed down to 45, but then knowing he had a duty to follow the law, he then ramped it back up to 83. And that's where we really get to this idea of not just deliberate indifference but arbitrariness, that we are shocking the conscience because there is no legal law enforcement rationale for then speeding up after you know you should be slowing down and after, as Hamby seems to suggest here, he had slowed down for a while but then ramped it back up. Now, of course, they disagree with us on that factual conclusion, but we get the benefit of that inference for the purposes of summary judgment. And if that is actually the case, that he was going 83 after he had gone 45 and after he knew he should not be exceeding 45, then I think we're in the land of the obvious case here, judges. I mean, we're in a situation where do you really need a case on point to tell an officer that you can't do that? Tell me why I should not think that Timken, excepting, I think, as you have, that you don't have a case on point, so officers are trying to read cases and figure out what they stand for. Why wouldn't you read Timken, a reasonable officer at least, read Timken, to suggest that even a wholly unnecessary high-speed driving in pursuit of a valid, although maybe insignificant, but a valid police response does not shock the conscience, which is sort of what we've got here. I mean, it seems like to me Timken's the closest case in the Fourth Circuit and it seems to say, yeah, this was totally unnecessary, we condemn the officer for chasing after this minor traffic violation, shouldn't have done it, it was not an emergency, but that does not shock the conscience. Right, I think there's a big distinction because one, that is a chase case when he's pursuing, and so even if it's not an emergency, there's still an urgency to do it, and I think that's the distinction. But why would we think that's, I mean, why is that any less urgent than responding to a non-emergency call of an officer? I mean, you know, some guy rolls through a stop sign versus an officer requesting assistance. I mean, if I'm supposed to be in the job of sort of weighing those, like the officer requesting assistance seems more urgent to me than the guy that rolled through the stop sign. I'm not sure how to be making that judgment. In the abstract, I would agree with you, if not for the fact that we've got Lawless on the radio saying, I don't need an emergency response anymore. But come to me. Imagine the case where there's never an emergency response, but he just says, listen, I need help. It's not a Code 3, but, you know, come to me. And I would read Temkin to suggest in that scenario that an officer that exceeds the speed limit, I'm not saying it's right in this regard, but I would read, I think a reasonable officer would read Temkin to say, even when not needed by an emergency, it does not shock the conscience to drive at an excessive rate of speed to, you know, in that case, catch a minor traffic violation, which to me would be analogous at least to an officer in need, though not emergent. But, Yara, I don't think that gives out of consideration to Lewis, which follows after Temkin. Right. That's your biggest, it seems to me, is your answer. Exactly. Lewis, I mean, that certainly trumps what Temkin might say. And what Lewis says is that deliberate indifference can be the standard when you've got a time to deliberate and you're demonstrating a lack of care under the circumstances. Here's the pre-quote from me. So this is why this timing thing is so important. Yes. Maybe you don't have time to deliberate, but if you do have time to deliberate, all you have to show is deliberate indifference. Correct, Yara. According to the Supreme Court. Correct. And I think for the purposes of summary judgment, we've got evidence to show he had time to deliberate, that he had this two minutes of time period to decide how he was going to react to these circumstances. And given what we know he knew when he was acting, that was plenty of time to reform his conduct or to make his conduct consistent with the obligations he had under the law. Lewis says this. When extended opportunities to do better are teamed with protracted failure to even the care, indifference is truly shocking. And so there is this case law out there, and I actually read in a brief there where they said something along the lines that Lewis doesn't clearly establish anything. I disagree. That Lewis does give us that. It tells us what the culpability standard is for a situation like this. And it also indicates that when you are, and Browder makes this point in citing Lewis, and that's one of the reasons we even cited Browder, is that Browder makes reference to Lewis talking about the intentional misuse of a vehicle. If there is intentional misuse of a vehicle, then you get a due process claim. You've gone to arbitrary. But Browder, I want to come back to Timken, but Browder, the intentional misuse there is for a non-police reason, so a non-law enforcement reason. He was going home to see his wife. Right? Like, if he was running drugs. Sure. If you, intentional misuse in the Browder context, I get your quote, but I don't think you can read that quote without reading the case, that it's a non-law enforcement reason. Not, because it sort of distinguishes, it goes through and distinguishes the other cases where they're, what you call chase cases, on the grounds that those were responding to law enforcement reasons. Well, two things, or a couple points here. One, Browder actually said that he was chasing a suspicious car. And so, I mean, that was his position. And so I, and also when it comes to our case. And the court rejected that for the purpose of his legal analysis. Well, I agree with that. But I mean, I do think that's an important distinction. I mean, he said there was actually a legitimate purpose there. But as for our facts, the idea that he had a legitimate reason to be going 83 is contrasted with what he knew and what he was saying contemporaneously. He's saying at the time, I've got to go code one, which means I've got to go just 45 miles an hour. And so what is the legitimate law enforcement purpose for going 83? Sure, he's got a legitimate purpose to be going to Lawless. Does he have a legitimate law enforcement purpose to be going 83 to Lawless? And I think that's the core question. And that's why he's intentionally misusing his vehicle. That was his intention to go 83. That's certainly a reasonable inference. Can I go back to Timken? Judge Motz rightly suggested not Timken because of Lewis. What about Timken is inconsistent with Lewis? I read the two as being consistent. And I may be wrong here, but it seems to not be inconsistent with Lewis. Lewis doesn't seem to preclude Timken at all. Help me understand what the distinction is. Well, I'm not suggesting it precludes it. I'm saying that it's both later and more pertinent case law here when it comes to the culpability standard and providing us more information about how you get to which culpability standard. Right, but what I'm talking about is the reason we were talking about Timken was the clearly established law point. And for that analysis, it doesn't seem like to me Lewis overrules Timken. And so a reasonable officer would look, it seems to me, to Timken, which is the closest related case in the Fourth Circuit. I understand out of circuit, but if I was trying to look in the circuit, Timken seems to be the closest case. And it doesn't seem to suggest that your conduct here was clearly established to be conscience-shocking, whatever the standard may be. Your Honor, I agree with Judge Kain that there is a substantial factual difference between Timken and this case. So the notion that these officers are going to be looking to Timken as guideposts for what to do under these circumstances when there is no chase, when there is an acknowledgment by the officer that you're going to. That's totally true, but the problem is that you've flipped the burden then, right? So it's your burden to show that it was clearly established. Of course. Right? Yes. And so, yes, you may be able to distinguish Timken, just like your colleague can distinguish Browder, right? Okay, that's fine. But if everybody can distinguish everything convincingly, what that means is there's no clearly established law. Yeah, I don't agree with that either, Your Honor, for a couple reasons. One, I mean, even under the Supreme Court's current version of and their back and forth with the Ninth Circuit about what constitutes clearly established, they still make room for the idea of the obvious case. The Westby case even does that. They still make room for the obvious case, and, again, that's why I think Browder does come in here. We're not asking you to just apply Browder here. Well, what Browder says is, look, this is a potentially murky area of that dividing line between a legitimate government purpose and arbitrary conduct. But what he also says is we're nowhere close to that line. We are nowhere close to this line. And I would argue that we are actually in a worse case here than the facts of Browder because in Browder he didn't have a specific order saying don't do what you're doing. Here he had a specific order from contemporaneous order from his boss just a couple minutes earlier telling him do not go 83 effectively. You've got to go and follow the speed limit. You've got to go code 1. And so that, I think, even takes this case beyond the facts of Browder. And so I think, again, just because you say, okay, fine, they could potentially, you could say maybe Temp and Guzzard does not apply here, you've still got to make room for the obvious case. And we think that this reaches that standard. Like, for example, the Sims case that this court had a couple years ago, a Fourth Amendment case basically where an officer for some reason asked a suspect to manipulate his genitals in order to get a picture, and the court said, sure, we don't have a case on that one. But, I mean, come on. But the difference there is that there was not contrary case law out of other circuits. I mean, even accepting that, right, I mean, one thing it seems to me that you have a problem with is the Eighth and the Ninth Circuit. You know, sort of we talk about in plain error cases, for example, that an error is not plain when there's a division of authority, right? It seems to me that at a bare minimum on the clearly established law for what you want to call the clear case example, there can't be a division of authority, can there? No. Well, division of authority means that you wouldn't be able to apply that principle of clearly established, meaning you can look to other circuits for consensus. That would be true. But at the same time, Your Honor, this, I think, gives me an opportunity to address the Sowers case that was mentioned. One, the question that the court found was not clearly established or the principle of law that was not clearly established at that time was whether the intent to harm standard applies to non-emergency chase cases. That's not the question here. So when you say you've got contrary law out there from the Eighth and the Ninth Circuit, I don't necessarily agree with that. I don't think that Sowers is contrary. I don't think it addresses the same situation that we're dealing with here. And so we are going, think about what Qualified Immunity really is designed to do at its core. It's designed to protect against bad guesses in gray area. And I would ask the court to just ask those two questions. One, was this a gray area that you shouldn't violate your contemporaneous order from your boss telling you to go to Code 1, which you've acknowledged, which you said I should be? And two, is that a bad guess or does that go to a higher level to deliver indifference? And my proposition, Your Honor, is that it goes far beyond a bad guess. I mean, because think about it. If you take that standard, then you're running dangerously close to something this court says you can't do, which is say that you can't have a clearly established law in a novel factual circumstances. And I could quote case after case which says that just isn't the law. You can. Your Honor, I see my time is up, but since it is my only moment, if I could have just 15 seconds, if you think necessary, to address Parrott-Hudson. Go ahead. Parrott-Hudson is limited to procedural due process cases because procedural and substantive due process cases are fundamentally different. The deprivation or the violation occurs at different points. The deprivation itself is a due process violation in the substantive due process realm, and Temkin actually says that. And in a procedural due process case, the deprivation isn't a violation unless there's an absence of due process. And in those instances, those limited instances, then it becomes important to ask did they get proper process before or if process was not feasible for, is there a post-deprivation remedy? And so there's a substantive difference between those two strands of due process claims, and that's why Parrott-Hudson ultimately doesn't apply under these circumstances. Thank you, Your Honors. Thank you. Mr. Logan. Thank you, Your Honor. Very briefly. Just to make sure I understand your argument, on the Parrott-Hudson argument, I don't see you responding to the Temkin argument. It seems to me that Temkin does reject this argument pretty plainly. Are you, I mean, and you may just be preserving it, and that is a very responsible and respectable answer to say, yes, this is precluded by current Fourth Circuit law, but I'm preserving it because either I think the en banc court or the Supreme Court should have the opportunity to take a look at it. I'm preserving it, Your Honor. Is that your position? Yes. I didn't understand that as your position in your papers. But is that your position now? I believe the Parrott-Hudson argument has not, I mean, I don't understand, maybe it's my ignorance. I don't understand why there's a difference between the application of, between procedural law and substantive law, as far as the Parrott-Hudson argument is concerned. Right. But my question is different is whether, does Temkin foreclose it, right? I mean, that's, there's an, we could have an interesting discussion about it. But what I'm wanting to sort of just understand your position on is whether you believe, in light of Temkin v. Frederick County, and the discussion, and I would say rejection of the Parrott doctrine to the substantive due process claim raised there, that that is a binding decision of the Fourth Circuit, such that this panel, whatever our views about this doctrine, lacks the power to do anything about it. Well, I don't read it quite as rigidly as you do, but so I would have to disagree that it is dispositive, but I also go into that argument for preservation purposes as well. So you think, though, that it's a winner for you, right, for us right now. You have two reasons. One, you're preserving it for Supreme Court review, and two, you think that there is a problem under Parrott-Hudson, right? Yes. Right now, and we should resolve that, and Circuit Precedent doesn't do away with that. I think Parrott, okay, yeah. I think it should be addressed now. I invite the Court to address it. So why? How does Circuit Precedent not foreclose? Because I don't read the, I suppose it's just a disagreement over whether or not it is exhaustive and whether or not it is so clear a disassociation or disavowal of the Parrott doctrine. My main argument goes back to the qualified immunity argument. I apologize to the Court for not remembering the exact language of the call regarding cancellation of the Code 3, but it has now been reviewed, and the word in the call was could. It wasn't an order as such, but could from the supervisor. No, I think that's not actually. I thought that was what you said. Officer Loftus said that you could, right? And then I thought, what I'm unclear about, and I meant to ask him about it, and I'm glad you raised it, is Officer Loftus, who's the guy on the street, says you could drop down. I don't actually see the supervisor order him to go to Code 1. I agree McKinney acknowledges it, he says that's what he's going to do. He's hearing from Lawless, yes. Right, but that's not from his supervisor, that's from the other officer on the street. That is. So you're changing what you got up and told us from the very beginning. You said his officer told him that, supervisor told him. That's what you said. Supervisor told him to continue to call. No, but to go down to Code 1. I'm not asking trick questions. You said he was told to go to Code 1. If I misstated, I'm sorry, I don't remember. So he wasn't told to go to Code 1? He told the conversation was about what Lawless said. No, he said his supervisor, this was part of your argument that he was still, it was the prelude to the argument that he was still to continue on to the accident. But he was to go down to Code 1, but continue on to the accident. That's what he said, his supervisor said to him. In fact, I don't mean to cut you off, but the judge's order, I found this confusing so I was trying to get to it. Apparently I do too, I'm sorry. The judge's order below does say the supervisor canceled the Code 3. Does this have to do with the recording of conversations going back and forth that seems to be not a good recording? It's a very fluid situation. No, that's not the question. It is a fluid situation, but that's not my problem with the recording. It looks like we don't have all of the conversation. It stops and starts and begins with someone else. I don't know, maybe that's inherent, maybe that's the way people talk, like I talk. But it's a little, I don't think it's verbatim what was going on. I think some words are left out. I was taking the language from the order as far as my presentation. That's what the order. The district court's order, is that what you're saying? The district court's order said that. My point is. And that at least appears, and I'm not trying to cut you off, but that at least appears to be the district court's interpretation of the CAD report. Correct. Is CAD the thing that goes back and forth? It's the written thing, so it's like a written log of what's happening, not the recording of what's happening. Correct. When we're looking at 43, this is the officers describing what they're hearing. Because an officer driving, however fast he's driving, hopefully is not reading the CAD information. But there's another recording. You're going back and forth. Maybe I've hallucinated this. But you hear many voices on it. There was the dispute between what was, I thought, the CAD, and this other thing, whatever it was. Yes. So in the other thing, is there a decision to step down? An order to step down? You got me confused, and I'm sorry. Okay. Forget it. I'm sorry. We'll look at the record. Do you have anything further? Yes, Your Honor. I'd just like to make a couple of other points. If he was, you know, you talked about he was driving at a high rate of speed, even though you recognize the cases that say even under those circumstances, you say it's not right, but the court did not impose liability under those circumstances. It may not be right. But that's why South Carolina has a Tort Claims Act. And that has been addressed under the South Carolina Tort Claims Act. We referenced eight cases in our brief dealing with what we thought were analogous cases, three of which are post-Lewis. One was the Leady case. That was a non-emergency call. The officer was going 35 to 40 miles per hour over a posted speed zone without his lights and siren. And the court said, Eastern District of Pennsylvania, said that there was no 14th Amendment liability. The Greer case, also after Lewis, non-emergency, but still required a rapid response. Well, I think that's the question. That's why the timing is so important here. You know? Well, what I'm asking this court to do is take the facts that are in this record. And I don't believe that the law is well established to apply those facts and create and say that that's a 14th Amendment violation. Due process clause. The law was not established as of 2016 that that type of conduct, and that's in the Sawyer case, that's in the Leady case, that's in these other cases that I cite, and the Tempson case, was not sufficient to put the officer or officers on notice that that conduct could subject them to the 14th Amendment liability. If you want to go that path, then that's up to y'all. But at least under the facts in this case as established, that Judge Kaine had before him and admitted in his order, in effect, that the law was not beyond debate, was not clearly established, and imposed liability on this officer. If you want to do it like Judge Troxler did in the Doe case, then that's your prerogative. But take these facts, find qualified immunity, I respectfully request. Thank you very much. Thank you so much.
judges: Roger L. Gregory, Diana Gribbon Motz, Julius N. Richardson